☑ Original   ☐ Duplicate Original

CLERK'S OFFICE
A TRUE COPY
Jun 12, 2023
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)* )<br>**Information associated with the Facebook** )<br>**account, CappoGee1300, ("Target Account"),** )<br>**as further described in Attachment A** ) | Case No.  **23-M-386 (SCD)** |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Eastern _____ District of _____ Wisconsin _____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B,

**YOU ARE COMMANDED** to execute this warrant on or before     6-26-23     *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Stephen C. Dries _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   6-12-23 10:30 am _____        *Stephen C. Dries* _____
                                                                                          *Judge's signature*

City and state:   Milwaukee, WI _____        Honorable Stephen C. Dries, U.S. Magistrate Judge
                                                                                          *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# **ATTACHMENT A**

## **Property to Be Searched**

This warrant applies to information associated with the Facebook account below, that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

CappoGee1300, ID# 100089580912968,

## ATTACHMENT B

### Particular Things to be Seized.

## Information to be disclosed by Meta Platforms, Inc. ("Meta")

 To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for the user ID listed in Attachment A:

    a.  All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

    b.  All activity logs for the account and all other documents showing the user's posts and other Facebook activities from April 1, 2023 to present;

    c.  All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from April 1, 2023 to present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

d. All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e. All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

f. All other records of communications and messages made or received by the user, including all encrypted or private messages, chat history, video calling history, and pending "Friend" requests from April 1, 2023 to present;

g. All "check ins" and other location information;

h. All IP logs, including all records of the IP addresses that logged into the account;

i. All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

j. All information about the Facebook pages that the account is or was a "fan" of;

k.  All past and present lists of friends created by the account;

l.  All records of Facebook searches performed by the account April 1, 2023 to present;

m.  All audio messages sent by the account and messages received by the account from April 1, 2023 to present;

n.  All video messages sent by the account and to the account from April 1, 2023 to present;

o.  Any and all location data that is recorded by Facebook related to the account from April 1, 2023 to present;

p.  All information about the user's access and use of Facebook Marketplace;

q.  The types of service utilized by the user;

r.  The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

s.  All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

t.  All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within twenty-eight (28) days of service of this warrant.

## II.  Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of in violation of Title 21 United States Code Sections 841(a)(1) and 846, involving Yosayf SMITH and other identified and unidentified individuals since April 1, 2023, to present, including, for the user ID identified on Attachment A, information pertaining to the following matters:

(a) The sale of illegal drugs, any preparatory steps taken in furtherance of the criminal scheme, and communications between SMITH, and others related to the relevant offense conduct of the sale of illegal drugs.

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation; and

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).



CLERK'S OFFICE
A TRUE COPY
Jun 12, 2023
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched* ) | Case No. **23-M-386 (SCD)** |
| *or identify the person by name and address)* ) | |
| Information associated with the Facebook account, ) | |
| CappoGee1300, ("Target Account"), as further ) | |
| described in Attachment A ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Eastern_____ District of _____Wisconsin_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841; & 846 | Distribution and possession with intent to distribute controlled substances; Conspiracy to distribute and possess with the intent to distribute controlled substances |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

BRADLEY KURTZWEIL Digitally signed by BRADLEY KURTZWEIL
Date: 2023.06.09 10:41:50 -05'00'

*Applicant's signature*

Bradley Kurtzweil, ATF SA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____telephone_____ *(specify reliable electronic means).*

Date: ____6-12-23____

*Judge's signature*

City and state:  Milwaukee, WI        Honorable Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Bradley Kurtzweil, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.        I make this affidavit in support of an application for a search warrant for information associated with the following Facebook account: CappoGee1300, ID# 100089580912968, (herein referred to as "**Target Account**"). The Subject Account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta") a social-networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under Title 18, U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), to require Meta to disclose to the government records and other information in its possession, including the contents of communications, pertaining to the subscribers or customers associated with the **TARGET ACCOUNT**.

## BACKGROUND, TRAINING & EXPERIENCE

2.        I am a Special Agent of the United States Justice Department, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Milwaukee Field Office. I have been so employed since March 2020. My duties with ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

3.        I completed approximately 26 weeks of training (approximately 1000 hours) at the Federal Law Enforcement Training Center (Glynco, Georgia) and ATF's National Academy. The training included courses related to constitutional law and search and seizure. I also received training on conducting criminal investigations, including interviews, surveillance, and evidence collection.

4. Prior to joining ATF, I was a sworn Police Officer in the State of Illinois from March 2011 to March 2020. I completed 12 Weeks (approximately 480 hours) of basic training at the Illinois State Police Academy from April 2011 to June 2011.

5. My most recent position was with the Bolingbrook Police Department in Bolingbrook, Illinois, where I was a Patrol Officer from December 2012 until March 2020. From July 2017 until March 2020, I also served as an Evidence Technician, assigned to Patrol. During my time in Bolingbrook, I received eight Written Recognitions and two Commendations.

6. During my career as a Police Officer, I attended approximately 520 hours of additional training in areas including evidence collection, interview/interrogation, arson and explosives, gang investigations; and drug investigations.

7. The information below is known to me through my personal knowledge, training, and experience, and through information provided to me by other law enforcement officers, who have provided information to me during their official duties and whom I consider to be truthful and reliable.

8. I submit this affidavit for the limited purpose of demonstrating sufficient probable cause for the requested warrant. It does not set forth all of my knowledge about this matter.

9. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that possible crimes of distribution and possession with intent to distribute controlled substances and conspiracy to distribute controlled substances, violations of Title 21, United States Code, Sections 841(a)(1) and 846, have been committed and will be committed by Yosayf SMITH (XX/XX/1997) and other unidentified subjects. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

10.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, see 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

### DEBRIEF OF CONFIDENTIAL SOURCES

11.     Beginning in February of 2023, ATF Special Agents (SAs) and Officers from the Lake Winnebago Area Metro (LWAM), hereinafter referred to as "Investigators," began investigating an armed drug trafficking organization operating in the Eastern District of Wisconsin (WI).

12.     On February 21, 2023, SAs Alex Erlien and Paul Kozelek of the ATF met with a confidential human source (CHS) at Fox Lake Correctional Institution (FLCI). The CHS advised ATF SAs that he was recently approached by Sherman THREETS (XX/XX/1984) who was known to the CHS from when they both were in a local jail in the Winnebago area of WI approximately 10 years ago. This CHS has 9 felony convictions; 1 for theft under false pretenses, 5 for forgery/uttering, 1 for misappropriation of identification, 1 for theft with habitual criminality, 1 for armed robbery with habitual criminality. The CHS also has a misdemeanor conviction of theft/ false representation. The CHS is cooperating with law enforcement in exchange for potential consideration on the state sentence he is currently serving. I have taken steps to corroborate the information provided by the CHS such as UC meetings, queries of law enforcement databases, corroborating the CHS's info with law enforcement records.

13.     THREETS told the CHS that he did 10 years in the federal prison system for a

large drug case and is now pending more federal charges while at FLCI. THREETS advised the CHS that he was caught with 14 pounds of methamphetamines and 3 kilograms of cocaine. THREETS asked the CHS if he knew anyone that would be willing to find THREETS someone to take his charges for him in exchange for a good price on kilograms of cocaine. *Your affiant is aware that "take his charges" or "take the case" are slang terms that mean having someone intentionally lie and admit that they did the illegal activity that someone else did, and has been charged with, as a way of fraudulently proving the person's innocence.* THREETS provided the CHS a visitor form to have filled out by whoever the CHS knew that would be willing to take his case. The visitor form would then be turned in by THREETS so that THREETS could meet this person during a visitation. During the visitation, THREETS and this person would arrange the delivery of the kilograms of cocaine and how that person would take THREETS' case for him. The CHS stated that he would reach out to his brother to see if he knew of anyone that would being willing to do this for THREETS. The CHS did not reach out to anyone and instead provided this information to ATF SAs.

14.    After the CHS and the ATF SAs ended their meeting, SA Erlien asked Capt. Schueler of FLCI to check his internal database for THREETS. Capt. Schueler advised SA Erlien that THREETS is currently in custody at the FLCI and is awaiting trial for a federal conspiracy to distribute a controlled substance case stemming from the Eastern District of Wisconsin. After leaving FLCI, SA Erlien contacted Investigators from LWAM who confirmed that THREETS' current charges stem from a drug investigation with LWAM. LWAM investigators also confirmed that THREETS is a large-scale drug dealer that would have access to kilogram weights of drugs and that they have had information that THREETS has attempted to influence Confidential Informants and other witnesses in the past in order to have them falsify

their testimony. LWAM investigators confirmed that when THREETS was arrested, law enforcement recovered approximately 12 pounds of methamphetamine in his house.

15. On March 2, 2023, ATF SAs met with the CHS at FLCI. During this meeting the CHS provided SA Erlien a FLCI visitor questionnaire that was filled out and signed by THREETS. THREETS gave this form to the CHS to have the CHS send it off to someone who would be willing to meet THREETS and discuss taking his case for him. THREETS signed and dated that form on February 13, 2023. The visitor form is meant to be filled out by an inmate if they have someone they want to be placed on their list of approved visitors. The FLCI mandates that the inmate fills out a portion about their information and sign it before mailing it to whomever they wish to have placed on their visitor list. The recipient then must place their information on the form and mail it back into the FLCI so that they can be background checked and then placed on the inmate's visitation list.

16. During the meeting, the CHS advised ATF SAs that THREETS further explained to the CHS that he was moving kilograms of drugs from the west side of Chicago to the Lake Winnebago area. THREETS, being aware that the CHS is familiar with the west side of Chicago, told the CHS that the kilograms were coming from a place near the intersection of Loomis and Roosevelt.

17. On March 7, 2023, SA Erlien filled out the original FLCI visitation form that was provided to the CHS by THREETS with the ATF UC's information. That form was then sent via USPS first class mail to the FLCI visitor processing. Approximately 1-2 weeks later SA Erlien was advised that the UC's (this UC will hereinafter be referred to as SA # 6208) visitor application was approved for him to visit with THREETS.

18. On March 10, 2023, at approximately 7:00pm, SA # 6208 received a phone call

from THREETS.  THREETS asked if SA # 6208 had gotten the "visiting form" to which SA # 6208 replied, that he did and that he had submitted it earlier in the week.  THREETS stated that now that he knows SA # 6208 submitted that form, he will "shoot a request" to the staff asking them to process a visitor form that should have been received by FLCI for him.

19.     On March 29, 2023, SA # 6208 met with THREETS at the FLCI in an UC capacity.  THREETS expressed his appreciation for SA # 6208 coming to meet with THREETS and asked SA # 6208 about the criminal enterprise SA # 6208 represented. SA # 6208 informed THREETS that SA # 6208 belonged to an outlaw motorcycle gang (OMG) that trafficked illegal drugs, firearms, and explosives. SA # 6208 informed THREETS that SA # 6208's OMG was active in the Midwest region; however, the OMG was seeking to expand their illegitimate businesses into additional regions of the United States.

20.     THREETS explained his goal for that day's meeting was to "get on the same page" with SA # 6208 regarding the possibility of SA # 6208 assuming the legal responsibility for THREETS's current federal criminal charges. Without any prompting from SA # 6208, THREETS provided SA # 6208 with details regarding THREETS's historic and current criminal activity which included detailed information regarding his drug trafficking operations and that he was recently arrested in conjunction with a search warrant that yielded "12 pounds of ice [methamphetamine], 3.5 bricks [kilograms] of coke[cocaine], and 100 grams of fentanyl" being recovered from THREETS.

21.     After THREETS detailed his current criminal charges, THREETS asked, "What y'all need from me. what y'all expect from me *inaudible*?" SA # 6208 explained in exchange for SA # 6208 assuming full responsibility for THREETS's current federal drug charges, SA # 6208's OMG expected long-term supply of methamphetamine from THREETS/THREETS's

methamphetamine source. SA # 6208 stated his OMG was trafficking 2-4 pounds of methamphetamine per month; however, the OMG was looking to increase the amount of methamphetamine being trafficked to 10-15 pounds per month. SA # 6208 further explained that before he would be taking full responsibility for THREETS's case THREETS would need to organize SA # 6208 getting supplied methamphetamines up front and before THREETS is released from prison.

22.     THREETS stated he could possibly contact a methamphetamine source in "Appleton" (WI). THREETS described this individual as an Asian male named "Tom LEE." THREETS claimed he trusted LEE and has known LEE for a significant amount of time through the illegal drug trade. THREETS stated he has "fronted" methamphetamine to LEE in the past and also stated, "He's [LEE] a middleman type of dude. He's not really one of my people that you're gonna meet. What I know. he has access to what I need, and he'll do what I need him to do because he wants me to be plugged in too... My little homie, he's a good little dude. Uhhh.. he's a good little dude, he really is." SA # 6208 informed THREETS that SA # 6208 would be open to purchasing methamphetamine from LEE, despite the fact LEE would not be the long-term methamphetamine source for the OMG. THREETS then stated, "I'm going to try to reach out to him myself. If I don't, you're going to have to call him yourself and tell him, 'Hey Sherman wants to get ahold of you he needs to talk to you this is important.'" SA # 6208 informed THREETS that SA # 6208 did not have any issue with this arrangement.

23.     On May 11, 2023, at approximately 10:12 A.M., SA 6208 received an incoming call from THREETS. Upon the call being connected, SA 6208 advised that he/she had not been able to get in contact with LEE. THREETS explained he had made arrangements with other methamphetamine suppliers to sell methamphetamine to SA 6208. THREETS stated, "Now what

I ended up.. reaching out.. you're just gonna have to deal with my family.. I don't wanna say too much more." SA 6208 asked THREETS to not disclose any further information via the recorded prison telephone and advised THREETS that SA 6208 would meet with THREETS in person the following week. THREETS acknowledged that SA 6208 would come to visit him (THREETS) at FLCI and then stated, "We'll talk then. But just know that this shit [THREETS's family] that I.. this is good, you know?"

24.     On May 17, 2023, at approximately 10:30 A.M., SA 6208 arrived at FLCI and met with THREETS.  SA 6208 and THREETS exchanged greetings before THREETS asked SA 6208 to retrieve a pencil and sheet of paper from the security desk. THREETS advised he had written down the information he needed to pass along to SA 6208, but FLCI staff prohibited THREETS from bringing the sheet of paper into the visitation building.  SA 6208 obtained a pencil and a sheet of paper from FLCI staff and then returned to the visitation table. THREETS then wrote multiple pieces of information on the paper before turning the paper over to SA 6208 (*please see the image below*).



25.     THREETS then explained each written item and also provided directions for SA 6208 to follow.  THREETS' mother (HAYES-HENDERSON), who utilizes the nickname "yoo-yoo" had been advised by THREETS that SA 6208 would be contacting her and that THREETS's mother should assist SA 6208 due to the fact that SA 6208 was assisting THREETS with obtaining his (THREETS's) "freedom." THREETS provided HAYES-HENDERSON's telephone number, "(920) 376-6268."     THREETS advised SA 6208 would "meet with [THREETS's] mom" at her residence, located at 59 East Reese Street, Fond Du Lac, WI. *Agent Note – SA 6208 identified through open-source databases that HAYES-HENDERSON resides at 59 ½ East Reese Street, Fond Du Lac, WI.* THREETS stated HAYES-HENDERSON informed THREETS, via telephone, that she would meet with SA 6208 once the SA had contacted her. THREETS stated that it would be incumbent upon SA 6208 to explain to HAYES-HENDERSON the particulars of the agreement between SA 6208 and THREETS. THREETS stated if SA 6208 provided an explanation for how SA 6208 would be assuming legal

responsibility for THREETS's federal drug charges, HAYES-HENDERSON would assist SA 6208 by facilitating an introduction between SA 6208 and a member of THREETS's extended family that would sell pound quantities of methamphetamine to SA 6208. THREETS added, "She's gonna put you in contact with.. I've got some cousins.. like I said, you're dealing with family now." THREETS stated a large portion of his family were engaged in criminal activity. THREETS stated that he was cellmates with his father, grandfather, and cousin while he was incarcerated at a State of WI prison in Stanley, WI, sometime around the year of 2008. THREETS stated he and his family members were incarcerated for drug-related crimes and stated, "We do it big I guess. Everybody [in THREETS's family] goes to jail for dope."

26.     THREETS stated the four names written on the left side of the sheet of paper in Figure 1 were relatives of THREETS, and that he believed all of these individuals to be engaged in the sale of illegal drugs. THREETS advised "Tanig" (pronounced by THREETS as "Tan-gee"), "Kobe," and "Hindo/Hollis" were THREETS's cousins and "Kevin" was THREETS's maternal uncle. THREETS stated that HAYES-HENDERSON communicated with "Kevin" via Facebook Messenger.

27.     On May 23, 2023, met with HAYES-HENDERSON at 59 ½ E Rees St. Fond Du Lac WI. SA 6208 explained his relationship with THREETS and also explained that SA 6208 intended to assume legal responsibility for THREETS's federal drug charges in exchange for SA 6208 being supplied with pound-quantities of methamphetamine. HAYES-HENDERSON informed SA 6208 that THREETS had made no mention of the agreement between SA 6208 and THREETS to her and then stated she wanted to call one of her other sons, who resided in the lower unit at 59 E Rees St, so that he could be informed of the information SA 6208 had just provided to HAYES-HENDERSON. HAYES-HENDERSON advised she was not a part of "that

stuff" (trafficking of illegal drugs) anymore, and at approximately 1:10 p.m. HAYES-HENDERSON utilized her cell phone to make an outgoing call. HAYES-HENDERSON then spoke with an individual, believed by SA 6208 to be her son that resided in the unit below, and requested they come upstairs. HAYES-HENDERSON's son, an unknown black male, entered the residence (herein referred to as "FNU LNU"). After speaking with HAYES-HENDERSON and FNU LNU about the agreement with THREETS, HAYES-HENDERSON agreed to call "Mike" who was also referred to by them as "Dimples". "Mike" declined to talk or meet with SA 6208 or any other of THREETS's associates. FNU LNU stated he believed "Dimples" did not want to meet with SA 6208 due to THREETS's failure to provide "Dimples" with advanced warning of SA 6208's meeting with HAYES-HENDERSON. FNU LNU further stated, "He just feel scared because [of] what Maurice [THREETS] got going on right now." *Agent Note – In this context, SA 6208 understood FNU LNU's statement to mean "Dimples" was cautious of anyone associated with THREETS due to the fact THREETS was incarcerated and also facing additional federal drug charges.* FNU LNU explained that he and HAYES-HENDERSON wanted to help SA 6208, but without any other information from THREETS, they would be unable to facilitate any introductions to a methamphetamine source. FNU LNU stated, "We really gotta talk to the man [THREETS] again, you know what I'm saying, try to do something before we get you right. We gotta talk to him [THREETS] and figure out what the fuck he got.. he trying to get going." *Agent Note – In this context, SA 6208 understood this to mean before FNU LNU and/or HAYES-HENDERSON could introduce SA 6208 to a methamphetamine source, FNU LNU and/or HAYES-HENDERSON would have to confirm SA 6208's identity and intentions.*

28. HAYES-HENDERSON stated THREETS had previously informed her that he would be calling her that night at "eight o'clock." FNU LNU stated he also wanted to speak with

THREETS at that time so they could ask THREETS about what he (THREETS) expected HAYES-HENDERSON to do on THREETS's behalf. HAYES-HENDERSON and FNU LNU stated, in substance, that once they had obtained clarification from speaking with THREETS, they would get in contact with SA 6208. Shortly after this, SA 6208 left the residence and traveled back to the debrief location.

29. On May 23, 2023, at approximately 2:55 p.m., SA 6208 received an incoming call from telephone number 414-928-5854; however, SA 6208 did not answer. At approximately 3:00 p.m., SA 6208 received a second incoming call from 414-928-5854; however, SA 6208 again did not answer. At approximately 3:00 p.m., SA 6208 received a text message from 414-928-5854 that read: "Hit the line I'm calling for Sherman [THREETS] I'm his cuzing [cousin] he told me too call you." *Agent Note – The user of this telephone number was later identified as Yosayf SMITH; therefore, the individual utilizing telephone number 414-928-5854 will hereinafter be referred to as "SMITH."* At approximately 3:01 p.m., SA 6208 received an incoming call from 414-928-5854. Upon the call being connected, SMITH asked if he was speaking with SA 6208's undercover persona, to which SA 6208 confirmed. SMITH then stated, "I'm calling for Sherman [THREETS], bro, my cousin" and "He [THREETS] told me to contact you, bro, so everything [supply of methamphetamine] is basically handled through me." SA 6208 informed SMITH that SA 6208 was driving and would need to call them back in several minutes. At approximately 3:11 p.m., SA 6208 initiated an outgoing call to 414-928-5854. Upon the call being connected, SA 6208 informed SMITH that SA 6208 had just met with THREETS's mother in Fond Du Lac. SMITH stated, "He [THREETS] said you can pull up on me [to purchase methamphetamine] if you need to." SMITH then stated, "My auntie was confused what was going on, that's all." SMITH also stated THREETS had informed SMITH about SA 6208 and THREETS's

relationship and then added, "Listen, bro.. I'm helping him out as far as him being in there. Whatever y'all talked about, that's y'all's business. I'm just here to.. whatever the fuck he tell me to go grab or whatever I need to go drop off." SA 6208 and SMITH then began discussing the possibility of SA 6208 meeting with SMITH prior to conducting any transactions involving methamphetamine; however, the call was ended for an unknown reason." At approximately 3:14 p.m., SA 6208 called SMITH (414-928-5854), upon the call being connected, SMITH stated, "I'll call you right back I got bro on the other line, alright?" SMITH then ended the call immediately after this statement.

30. At approximately 3:14 p.m., SMITH (414-928-5854) texted SA 6208, "Add me on fb [Facebook] cappo gee."

31. At approximately 3:24 p.m., SA 6208 received an incoming telephone call from THREETS via Fox Lake Correctional Institution (FLCI) recorded prison telephone. Upon the call being connected, SA 6208 informed THREETS of the SA's meeting with THREETS's mother and brother that occurred earlier that day. SA 6208 explained THREETS had failed to provide his family with the context surrounding THREETS's relationship with SA 6208; therefore, THREETS's mother/brother were unable to assist SA 6208 being introduced to a methamphetamine source, including "Mike" aka "Dimples." THREETS apologized for not providing additional information to his family with respect to SA 6208 and then asked if SA 6208 spoke to THREETS's "little cousin [SMITH]." SA 6208 stated SMITH had contacted SA 6208 immediately before THREETS called the SA. THREETS stated, "Add him [SMITH] on Facebook everything is fine… He [SMITH] got you."

32. At approximately 3:40 p.m., SA 6208 queried "Cappo Gee" via Facebook search and identified a profile (**TARGET ACCOUNT**) with vanity name "Cappo Gee (Nino Brown)."

SA 6208, utilizing their undercover social media account, then sent SMITH a Facebook friend request, which was instantly accepted by SMITH. At approximately 3:41 p.m., SMITH sent SA 6208 a message via Facebook Messenger that stated, "We locked in bro."

33.     At approximately 3:58 p.m., SMITH messaged SA 6208 via Facebook Messenger: "Iight cool ay I got city X On Stock" … "If you kno anybody who like it" … "I'll plug you $15 a pill they cost $40." *Agent Note – In this context, in addition to SA 6208's training and experience, SA 6208 understood this to mean SMITH was offering to sell SA 6208 ecstasy/MDMA that had been pressed into pills.* SA 6208 informed SMITH that SA 6208 was primarily interested in purchasing methamphetamine and they would inform SMITH if SA 6208 became interested in purchasing the illegal pills.  SA 6208 then asked SMITH, via Facebook Messenger, if THREETS had advised SMITH SA 6208 was seeking a narcotics trafficker that could provide a "steady line" of methamphetamine. SMITH replied, "Yeahh he did" and "It's that [steady supply of methamphetamine] with us."

34.     On May 25, 2023, investigators preserved the **TARGET ACCOUNT** through Facebooks law enforcement portal.  Investigators reviewed SMITH's criminal history and observed that SMITH is a convicted felon because of a 3rd degree sexual assault felony conviction in 2021 and two battery by prisoner felony convictions.

35.     Investigators know, through training and experience that SMITH's conversations with SA 6208 through Facebook are often not exclusive between SMITH and only SA 6208 and that SMITH is most likely using Facebook to communicate with others regarding the illegal sale of controlled substances.

<u>**TECHNICAL BACKGROUND**</u>

36.     Facebook owns and operates a free-access social networking website of the same

name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

37.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

38.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

39.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these

privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

40. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition,

41. Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

42. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

43. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other

information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

44.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.  Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.  Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.   Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

45.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.   The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can

also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

46.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

47.     Some Facebook pages are affiliated with groups of users, rather than one individual user.  Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group.  Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

48.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications. Facebook also retains Internet Protocol ("IP") logs for a given

user ID or IP address.

49.     These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

50.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

51.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a

52.     Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by

53.     Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing

a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

54.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and

2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

55.     Based on the forgoing, I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court of the Eastern District of Wisconsin is a district court of the United States that has jurisdiction over the offenses being investigated, 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook account below, that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

CappoGee1300, ID# 100089580912968,

## ATTACHMENT B

### Particular Things to be Seized.

## Information to be disclosed by Meta Platforms, Inc. ("Meta")

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for the user ID listed in Attachment A:

    a.  All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

    b.  All activity logs for the account and all other documents showing the user's posts and other Facebook activities from April 1, 2023 to present;

    c.  All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from April 1, 2023 to present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

d.  All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e.  All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

f.  All other records of communications and messages made or received by the user, including all encrypted or private messages, chat history, video calling history, and pending "Friend" requests from April 1, 2023 to present;

g.  All "check ins" and other location information;

h.  All IP logs, including all records of the IP addresses that logged into the account;

i.  All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

j.  All information about the Facebook pages that the account is or was a "fan" of;

k.  All past and present lists of friends created by the account;

l.  All records of Facebook searches performed by the account April 1, 2023 to present;

m.  All audio messages sent by the account and messages received by the account from April 1, 2023 to present;

n.  All video messages sent by the account and to the account from April 1, 2023 to present;

o.  Any and all location data that is recorded by Facebook related to the account from April 1, 2023 to present;

p.  All information about the user's access and use of Facebook Marketplace;

q.  The types of service utilized by the user;

r.  The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

s.  All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

t.  All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within twenty-eight (28) days of service of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of in violation of Title 21 United States Code Sections 841(a)(1) and 846, involving Yosayf SMITH and other identified and unidentified individuals since April 1, 2023, to present, including, for the user ID identified on Attachment A, information pertaining to the following matters:

(a) The sale of illegal drugs, any preparatory steps taken in furtherance of the criminal scheme, and communications between SMITH, and others related to the relevant offense conduct of the sale of illegal drugs.

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation; and

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).